Case is Two-Way Media Ltd. v. Comcast, Verizon, et al., 2016, 25, 31, and 32. Mr. Hine, when you're ready. May it please the Court. In 1995, there was no effective way to reliably deliver media streams over the Internet to a large number of users. The claims in the Two-Way Media patents recite critical aspects of the network architecture solution that it developed to overcome those problems. I'd like to begin by focusing on 187 Claim 1 to explain exactly how the claim recites those architectural features. And for that, I would respectfully direct the Court's attention to page 31 through 33 of the opening blue brief. And on those pages is a chart which includes the language of 187 Claim 1, as well as the constructions that were used in this case. Those constructions are the constructions that had been approved in prior litigation by two district courts. Chief Judge Head from the Southern District of Texas and Judge Garcia from the Western District of Texas. They were adopted for purposes of the 101 analysis in this case. I'm going to focus the Court, given the limited time, on the controlling the routing limitation, which appears on page 32. I'll note in passing before I do that that the converting limitation, the first limitation after the preamble in this claim, implicates, it relates to the source server that is responsible for generating the packetized audiovisual streams that are going to be sent over the packetized network. The controlling the routing limitation is directed to and recites aspects of both the distribution architecture and aspects of the control architecture. First, if we look at the construction, which is in the italicized portion after the underlying. Where do you find the architecture? In the claims? In the claims, Your Honor. The claims recite critical aspects of the architecture. If we look at the construction of controlling the routing, first, it requires a designated group of intermediate computers. That's in the construction of controlling the routing. Directing a portion of the routing path taken by the stream of packets from one of a designated group of intermediate computers. The computers are intermediate because they're between the source server that is related to the converting limitation and between the users in a packet switched network. The intermediate computers that are recited in this construction. Can you direct me? I'm kind of lost here. Are you talking about the 187 patent? I am, Your Honor. 187, claim one. And if you look at page 32 of the opening brief, the construction for controlling the routing that has been adopted in this case, the same construction that was adopted in prior litigation in the district courts, requires for that limitation directing a portion of the routing path taken by the stream of packets from one of a designated group of intermediate computers to the user in response to one or more signals from the user selecting the stream. That is the construction for that term. That construction recites specifically a layer of intermediate computers in the distribution system that correlates to the media servers that are in figure one of the 187 patent. That's on appendix page 80. What that means in the context of this claim in a packet switched network, what that requires is the addition of a distribution layer within something like the Internet that is a packet switched network. So you've got a modification that has to occur to a conventional Internet delivery platform because of the requirement of a designated group of intermediate computers in that packet switched network. That is entirely unconventional. In addition to that aspect of the distribution architecture, which requires the source server, the intermediate computers and the user, similar to what's shown in figure one with the primary server, the media servers and the user, the claim also specifies a very specific control sequence. The district court said that the patent points to the architecture of the system as the technological innovation, but that the claims do not recite that. Yes, Your Honor. That's exactly what he said, and that's where he committed legal error in this case. He did not take into account these claim constructions. He did not look at them and recognize that the claims require the architecture that's shown in figure one. This claim construction of controlling the routing specifically requires the architecture. Isn't this a judgment on the pleadings? It is, Your Honor, absolutely. And so necessarily, the judge, as part of that, needs to infer any facts, any findings in our favor, and I would submit he didn't do that, certainly with respect. Where do you infer those facts? Don't you look under the test that we've established, or that we didn't establish, Supreme Court, one that we follow. In the first step, we look at what are the claims directed to, and reading the claims, I don't see the architecture that I hear you say. Your Honor, if you're trying to figure out what the claims are directed to, as the Court recognized in the McRow decision, you have to take into account the constructions. And in this case, the constructions go to the heart and soul of the architecture that is used for this controlling operation. It is the entire focus of the specification, and it's also right here in the claims in these constructions. There's a designated group of intermediate computers. There's a control sequence that requires directing the streams. It specifically requires directing three aspects of it. Directing a portion of the routing path. That means you direct a portion, not the entire routing path. Specifically, you're directing the last leg of the routing path from one of the designated group of intermediate computers to the user. So you direct the stream from one of the intermediate computers to the user. Because of the construction, there are multiple. It's one of a designated group of intermediate computers. That means there are multiple possible routing paths through different intermediate computers. You're going to direct one of those, and you're going to do it in response to a user selection signal. So what we have here is a situation where there is a distribution layer within the Internet that doesn't conventionally exist. There is a distribution layer. It is controlled by a particular control sequence that is going to assign one of a designated group of intermediate computers to the user when the user requests the stream. It's a dynamic aspect. This entire operation is described in great detail in the specification in figures 8a, 8b, and 8c. And the way that the system works there, which is reflected in these claims, is that first a user selects one of the streams that it wants to listen to, it wants to watch. That then triggers a request that goes to the control architecture. In response to that, the control architecture generates a sorted list of media servers that the system can go to in order to get the stream. And then in response to that, the user goes to the first one on the sorted list and asks for the stream and gets the stream. That's the directing that we're talking about specifically in this claim. So what this claim requires is a distribution layer added to the Internet that's not there. It's completely an unconventional arrangement of the components. It's a new layer within the Internet with a control sequence that is specifically going to direct the users not back to the source server that's originally supplying the streams. It's going to direct the users specifically to one of multiple potential intermediate computers in order to get that stream and to get it sent to the user. This is a 20-year-old patent, right? It is expired, Your Honor. And it's drafted under old standards. Absolutely, Your Honor. It was drafted under old standards. The question is whether all that you're talking about is in the claims. I think what I'm talking about, Your Honor, are the constructions that were adopted in this case. I mean, that's specifically what I'm pointing to. Those constructions have been applied, as I said, by prior district courts in two different litigations. And so that is the construction we're using. That's the construction that the district court used. It requires specific hardware. It requires a specific control sequence. That architecture with those designated group of intermediate computers and with that control sequence is not conventional in a packet switch network like the Internet. In the Internet, from the source computer, you apply a destination address, and then the stream is routed in an uncontrolled, unassigned fashion to the user. There's no way to control any particular point along the way where that stream is going to go. This construction specifically requires going through one of a designated group of intermediate computers. That doesn't exist in a normal Internet routing situation. What difference does that make? The reason it makes a difference is it improves the system, and it makes it much more reliable. It fans out the distribution away from the source server. As it's described in Column 3, Lines 9 through about 28, you can fan out the distribution away from the source server. You can move it closer to the users. You reduce network traffic because you send a single stream to just the intermediate computers, the media computers for each channel that they're going to carry. And then from that point, the users are directed to that intermediate computer that's closer to them. And by directing the routing, you can pick specific ones of those intermediate computers and avoid network congestion that might exist. You can avoid bottlenecking problems. You can balance the load among these intermediate distribution computers. And so it changes, really, the paradigm where instead of going from the source, as typically happens in the Internet, to the user, you've added this entire layer of distribution servers and a control mechanism so that the user is getting the stream much closer. But at the end of the day, if the user is receiving a scrambled single, either under this method or some other method, that has to be fixed, correct? Yes, Your Honor. The packets are numbered. But how do you know how to correct that? How do you know that you need to correct? How do you know that the user has a problem? And the problem is that you have to receive a single from the user receiver telling you that there's a problem. Or the way that it would conventionally work, Your Honor, because it's a best efforts Internet, is you just don't get the packets. If they don't arrive in time and you're streaming, you're playing it back as you get it. That's what streaming means. You're playing it back as you get it. If the packets don't get there in time... The conventional system and looking at your system, either way you're relying on a user receive single. I mean, your claims say that. Absolutely. But you're really not claiming that part of the method. You're claiming the control architecture and the distribution architecture that eliminates some of that problem. The reason the packets are delayed, the reason they don't get there in time, is because of the network congestion that exists. That's one issue. I understand that. I just want to make sure that I also understand correctly that you're not claiming the user received singles. Well, it's part of the claim that the user does receive. That's not your invention, though. No, that's not part of the invention. It's the intermediate layer between the source server and the users in the control mechanism, the control sequence, that is responsible for the interaction of the user, the control architecture, and the media servers in order to have the stream get assigned from one of those intermediate computers and pass to the user. So let's say that we don't adopt your argument of relying on construction of the claims as part of the Step 1 analysis. What does that do to your argument? I think there's still a question there about what the court means by directing in its Step 1 analysis. It says direct the sent information. What does that mean? I mean, the only possible context for that, according to this patent, is it's the directing that's done by the control sequence. Putting that aside, it puts us into Step 2, and the question is whether or not this is an unconventional arrangement to deliver audio-visual streams in a packet-switched Internet-type context. With that, I'll reserve the rest of my time. Thank you, Mr. Heim. We'll give you your three minutes back. Mr. Farrell. Thank you, Your Honors, and may it please the court. Two-way's appeal in this case relies upon convincing the court that its claims are something that they are not. The claims at issue do not specify an end-to-end architecture. They do not provide solutions to network congestion problems or an improved method of load balancing. The words architecture, hierarchy, load balancing never appear in any of the asserted claims or even the proposed construction that Two-way has offered and that we're using at this stage of the case. As this court and the Supreme Court has often said, it is the asserted claims that are the focus of the Section 101 analysis, not claims that might have been written on some other embodiment in the patent or even on a commercial product. So, Counselor, how do you respond to your opponent's argument that when you take into account the construction that's been given to the claims that it's the construction that gives the architecture that we're looking at or we should look at? Your Honor, the construction is not sufficient to incorporate an architecture into this claim. What is required for Two-way's appeal is actually an embellishment of that construction in order to get to their features that my friend discussed during his argument. For example, Two-way argues that its construction mandates a network architecture that shifts the stream load, and I'm quoting from the brief, shifts the stream load away from the source server and distributes it across the intermediate computers or, quote, reduces network congestion or balances the load. Nothing in the claims as construed by Two-way requires these outcomes or even attempts to achieve these outcomes. What step one of the Alice test looks at is the character of the claims as a whole, to use the language from Electric Power Group. There's no plausible reading of this claim as construed that could lead to the conclusion that the character of this claim as a whole is a network architecture when that architecture is neither recited explicitly in the claim or the construction. Counsel for Two-way referred the court to column three of the patent, which I had focused on as well, because it's interesting, column three of the patent around line 17, line 17 through approximately 29, talks about, it starts with the topology of the Internet dictates the ideal. I'm sorry, what page? It's appendix 104, column three at 17 through 29. This is a detailed description of the embodiment that talks about places where the media servers might be located in their architecture, how the topology of the Internet dictates the ideal placement of media servers, and then it goes on to talk about how media servers might be placed here, they might be placed there, you might achieve different goals with one or the other. None of that is recited in the claim. There's nothing in the claim that says where the media server should be placed. In fact, Your Honors, I would submit this claim as construed by Two-way, focusing even on the controlling the routing claim element, which Two-way has, this would be satisfied in a packet-based network, such as the Internet, that had, say, three computers between the source and the user. What about Mr. Himes' point that at least two other courts have blessed these claims under 101? Your Honors, no. No other court has looked at these claims under Section 101. There's been no prior Section 101 challenge to these claims. Did you disagree with him, or did I misunderstand what he was saying? I think there may have been a misunderstanding about what he said. I don't think Two-way has ever contended that these claims have been— But I thought I saw something in the brief, too. They've been subject to Section 102 and 103 challenges by prior courts, but no previous litigant has challenged these claims under Section 101. So this construction, if you just had an architecture, a network, which the Internet surely is, but let's just focus it. You have source servers, sources of information. You have just three intermediate computers, and let's say in response to a user selecting content, all of the content, no matter what, flows through a single intermediate computer. The other two are idle. Now that wouldn't reduce load balance, that wouldn't balance loads, it wouldn't reduce congestion, it wouldn't achieve any of these goals, and yet I would submit it satisfies Two-way's construction because Two-way's construction doesn't require any means for distributing content across these media servers. It doesn't require any intelligence in the media servers for forwarding content to users. This is why the district court rejected Two-way's argument about this architecture because the architecture is simply not found in the claims. I would note also, Your Honors, that this was not to say that one could not write a claim about a specific architecture based upon the disclosure and the specification. I'm not offering an opinion about whether that would be valid under other provisions of the Patent Act, but one could imagine writing a claim reciting specific servers and a specific architecture and a specific interaction among those servers. In fact, Your Honors, Two-way asserted a fifth patent in this case, the 237 patent, which the claim is recited in defendant's brief below at Appendix 291 to 292, where you see a claim that actually recites multiple different servers serving different functions and interacting in a specific way. Now that claim was dismissed with prejudice while this Section 101 motion was pending, so it's not at issue now, but it's just by way of an example that, of course, one could write a very specific architectural claim, but that's not these claims. These claims are directed towards a simple goal. These claims are directed towards claiming exclusive rights over the idea of monitoring and keeping records on the distribution of streaming content using standard Internet protocols. I should add that the background of the invention in Column 1 gives the context, and this Court and the Supreme Court has looked at the background of the invention on a Rule 12 motion. It's often informative and provides appropriate context for understanding what the claimed invention is directed to under Step 1, as well as whether there's an inventive concept. And if you look at the background of the invention here, you see a description of Internet functionality, and in particular Internet streaming content functionality using IP multicasting. The inventors here didn't claim to invent IP multicasting. They described it as part of the background. And under IP multicasting, the way that operates, there is necessarily an intermediate computer. That's the way IP multicasting works, as explained in the background. There's what are known as M routers, which receive multicast packets and forward them on to multicast host computers. Those multicast host computers are ones that have been already determined to route a particular multicast because users have chosen to follow that multicast. Let's say you want to tune into a radio station. This is what was talked about in early years of multicasting. You sign up for an IP multicast of that radio station. There's M routers that will route content to you through M routers and multicast host computers. Those easily qualify as the intermediate computers that two-way relies upon here. That's why we submit that what these claims are not about, these are not the architecture claims. These are the claims that are focused on record-keeping and monitoring in the context of routing streaming media in a packet-based network. I want to mention a couple of cases that I think are directly on point. Council referred to the claim limitation in response to user selection signals. This is part of the controlling the routing that the content is delivered in response to user selection signals. There's a number of cases, all commercial. Both Affinity Labs cases versus Amazon and Affinity Labs versus DirecTV all involved distributing content in response to user selection. None of that was deemed to be either an inventive concept in those cases, nor would it be here as the background of this invention explains. As the court is aware, the record-keeping claim elements, whether it's determining the start and stop times or creating a log or determining the duration of the receipt of content for commercial purposes as these various claims recite, that type of basic record-keeping function has repeatedly been held not to be an inventive concept. That's from Alice to Electric Power Group, OIP Technologies, Ultramershal. All of those cases have held that mere data steps, data-gathering steps are not inventive conduct. I want to provide one more site here which is relevant to Two Way's argument on reply, which is to say that multicasting was young at the time this patent was applied for, and therefore they offered some improvement to multicasting. I would submit again the claims don't recite any improvement to multicasting. The claims cite very generic network functionality, and in fact are just reciting the most high-level description of streaming content using multicasting. But I would also note for the court that in Affinity Labs versus Amazon, I believe it's quoting there the TLI Communications case, the court noted that claims in those cases were deemed abstract, even though the technology at issue was nascent in the Amazon case. I think it was delivery of content using mobile phones. But what this court said, and I'm quoting from Affinity versus Amazon, was, quote, the claims there, quote, were directed to the use of conventional or generic technology in a nascent but well-known environment without any claim that the invention reflects an inventive solution to any problem presented by combining the two, close quote. My point here is that just because IP multicasting had been developed only a few years before and was still being deployed does not mean that you get a free pass under Section 101. Obviously, if you're not the inventor of IP multicasting, that can't be your technological contribution to the field or an inventive concept. So if the court has no further questions, I will rest. Thank you, Mr. Farrell. Mr. Heim will give you three minutes. Thank you, Your Honor. Let me begin by just clarifying for the court, when I referenced the prior district court litigation, it was in the context of claim construction. It was not in the context of a 101 ruling. So the claim construction is what was adopted in the prior courts. The courts didn't address the 101 issue. Secondly, counsel raised IP multicasting, and what we heard was an argument about why the claims are not novel and why they're not obvious. But we're not here today to decide whether or not the claims are novel or obvious. We're here to decide whether or not the claims recite patentable subject matter. The multicasting discussion that counsel had completely ignores the controlling the routing possibility. This patent... His argument was that even if claims or rather a method is nascent at the time of invention, that does not necessarily make it subject matter that's eligible for a patent. It might perhaps be considered, but it shouldn't be considered in this case. This is far from conventional technology. This is experimental technology. But more important... And if you look at A1522 through 28, it talks about the experimental nature. But it's also different. It's fundamentally different because IP multicasting required a tunneling connection at this point in time, as the specification refers to in column 6, lines 35 through 39. It required a fixed tunneling connection. There was no availability to be able to control the routing through different ones of intermediate computers to direct in response to a selection signal. The route was fixed. That was one of the problems with that system. What these claims require... And counsel really made the point when he started posing the hypothetical. What if you had three intermediate computers and you put them in the Internet? That's not the conventional Internet. The hypothetical is changing the conventional system that existed out there. That's what these claims require, a modification to the Internet platform. You have to add a distribution layer, a distribution point that the users are then directed to in order to complete the routing path. You add that control sequence. It's required by the claims. It's part of the directing. The claims are clearly technology-directed. They're focused on the intermediate computers, the ability to control the routing of the streams through the Internet. It solves a number of different solutions. It solves the problems with network congestion, server overload. It makes the system much easier to scale. And so for all those reasons, these patents, these claims, are directed to the exact type of inventions that the patent laws were designed to protect. Thank you, Your Honors. Thank you, counsel. We'll take the case under advisement.